**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **ERIC ABERNATHY,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **7:11-CV-116-O-KA** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant** | § | |

## REPORT AND RECOMMENDATION

By Order Referring Case (Docket No.4) this case was referred to the undersigned United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b) and Rule 72 of the Federal Rules of Civil Procedure for determination or recommendation.

### Factual and Procedural Background

On January 14, 2008, Abernathy filed an application for Title XVI supplemental security income payments, alleging a disability onset date of November 15, 2007 (Tr. 13, 103-109). He was then only a little over 19 years of age. (Tr. 103). Abernathy alleged that he was disabled due to anxiety disorder, "bipolar," asthma, and attention deficit hyperactivity disorder (Tr. 120). His application made no mention of diminished intellectual capacity. On December 17, 2008, an administrative law judge (ALJ) held a hearing at which Abernathy, represented by a non-attorney representative, and his mother testified (Tr. 13, 32-65). At the hearing Abernathy reported his difficulties with regular school work (arithmetic and reading)(Tr.36-37, 50) and trouble remembering instructions (Tr. 44, 60), but could not remember if he had been given an IQ or learning disability

1

test (Tr. 50-51).  In response to her son's representative's question, Abernathy's mother related that he had been tested for learning disability or intelligence in school but not since (Tr. 61-62).  The hearing concluded with the ALJ's invitation to Abernathy's representative to obtain and submit Abernathy's school records for her consideration since he was only 20 years old at the time of the hearing (Tr. 30-31).  A vocational expert was also present at the hearing and heard the testimony.  Later,  she completed interrogatories directed to her by the ALJ. (Tr. 176-180, 181-184).

In response to the ALJ's invitation and within a month of the hearing, Abernathy's representative forwarded to the ALJ Abernathy's school records along with some mental health records from two mental health facilities. (Tr. 164, 430-469).  Included in those records was the 2002 psychological evaluation of Abernathy by Pat N. Moran, PhD wherein he concluded that on the basis of IQ scores (Tr. 461, 465-69) and other criteria, Abernathy had "Borderline Intellectual Functioning."(Tr. 463).

Some twenty-one months later and after significant prodding by the claimant's representative,[1] the ALJ issued her decision on September 22, 2010 finding Abernathy not disabled (Tr. 13-26).  Abernathy appealed the ALJ's decision to the Social Security Administration's Appeals Council, which denied Abernathy's request for review on July 15, 2011 (Tr. 4-6).  Accordingly, the ALJ's decision became the Commissioner's final decision for purposes of judicial review.  Having exhausted his administrative remedies, Abernathy, by retained counsel, timely commenced the present action seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. §405(g).

---

[1]    Letters of  July 9, 2009 (Tr. 165); November 16, 2009 (Tr. 166); and January 15, 2010 (Tr. 167).

## The Decision

In the first page of her decision, the ALJ recited her goal to analyze Abernathy's claim pursuant to the regulatory-mandated five-step sequential evaluation process.[2]  In her recitation of step-two of the five-step process,  which addresses the issue of the severity *vel non* of the claimant's impairment or combination of impairments, the ALJ iterated the Commissioner's regulatory standards, but failed to cite or reference the 5th Circuit's *Stone*[3] decision or its standard. (Tr. 14, paragraph 3).

As she commenced utilizing the process, at step-one, the ALJ determined that Abernathy had not engaged in substantial gainful activity since his application date (Tr. 15-16). Then at step-two, the ALJ determined that the impairments expressly alleged in Abernathy's application for benefits (Tr. 120) (*ie*. asthma, hearing loss, mood disorder, and attention deficit hyperactivity disorder (ADHD)) were severe impairments (Tr. 16-19). Scant mention was made in the ALJ's step two analysis to Abernathy's intellectual functional capacity.[4]

The ALJ then proceeded beyond step-two to steps-three through five. At step-three, considering Abernathy's listed impairments (asthma, hearing loss,  mood disorder and ADHD) the ALJ determined that Abernathy's combined impairments did not meet or equal the requirements of any listed impairment for presumptive disability under the regulations (Tr.19-21). In making this

---

[2]       20 C.F.R. § 416.920(a)(4). "(1) Is the claimant currently working? (2) Does he have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent him from performing his past relevant work? (5) Does the impairment prevent him from doing any other work?"

[3]       *Stone v. Heckler*, 752 F. 2d 1099 (5th Cir. 1985.)

[4]       The ALJ did tangentially note that "Borderline intellectual functioning was suspected, but referred to a consultive psychologist's mental evaluation report that recited "rule out borderline intellectual functioning."(Tr. 18, Paragraphs 1 and 4).

3

determination the ALJ did not mention Abernathy's intellectual functioning capacity.   Next, the ALJ proceeded to determine Abernathy's residual functional capacity (RFC). Based upon the evidence as a whole, the  ALJ found that Abernathy retained the RFC for work at all exertional levels that did not require unprotected heights, fast-moving machinery, or dangerous work sites (Tr. 21). The ALJ concluded that Abernathy could perform simple tasks with oral instructions, make simple work-related decisions, interact appropriately with coworkers and supervisors for superficial, work-related purposes, respond to changes in a routine work setting, but could never work with the general public (Tr. 21).

At step-four, the ALJ determined that Abernathy had no past relevant work (Tr. 24). At step-five, the ALJ found, based on the vocational expert's response to interrogatories, that Abernathy retained the ability to perform other work existing in the national economy (Tr. 25-26, 175-180).  The interrogatories made no statement or inquiry with respect to Abernathy's intellectual capacity or functioning. But based on the answers to the interrogatories and the record before her, the ALJ concluded that Abernathy was not disabled within the meaning of the Social Security Act at any time through the date of her decision (Tr. 25-26).

## Standard of Review

The standards for review of decisions of the Commissioner are well established and need not be reiterated herein.[5]

## The Issues

Abernathy raises the following issues:

1.      Whether the ALJ failed to apply the appropriate legal severity standard at Step Two when she impliedly found Abernathy's limited intellectual functioning was not a

---

[5]      *Bownds v. Astrue*, 2011 WL 4091507, pp.1-2 (N. D. Tex. 2011.

"severe" impairment, since she failed to cite *Stone*[6] or otherwise apply the *Stone* standard.

2.  Whether the ALJ failed to apply the appropriate legal standard in assessing Abernathy's mental RFC.

3.  Whether the ALJ's implicit finding that Abernathy does not meet or equal listing 12.05C is not supported by substantial evidence.

4.  Whether the ALJ denied Abernathy due process and his right to cross-examine the vocational advisor at a supplemental hearing Abernathy had requested.

*Stone* Error

The Commissioner has issued regulations that define a "severe" impairment as one which significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). See also 20 C.F.R. §§ 404.1521(a), 416 .921(a). The Fifth Circuit, however, has found that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act. *Stone*, *supra* Note. 3.  Instead, the Fifth Circuit has established the following standard for determining whether a claimant's impairment is severe:

> "An impairment is not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone*, 752 F.2d at 1101 (emphasis added).

The *Stone* severity standard does not allow for **any** interference with work ability, not even minimal interference. *Scroggins v. Astrue*, 598 F.Supp.2d 800, 805 (N.D.Tex.2009) ("*Stone* provides no allowance for a minimal interference on a claimant's ability to work.") The courts are to presume that the ALJ used an incorrect standard for measuring severity at Step Two of the sequential evaluation process if the decision fails to refer to the *Stone* opinion by name or cite language of the same effect. See *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir.2000).  A case, however, will not be remanded simply because the ALJ did not use "magic words," but remand is required

---

[6]      Note 3, *supra.*

where there is no indication that the ALJ applied the correct standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir.1986).

Even now after 27 years under the imprimatur of the *Stone* decision, whether through puckishness or misadventure, direct instruction or inadvertence, administrative law judges appearing in this Circuit have repeatedly, as in this case, failed or refused to reference *Stone* or its "severity" standard in their decisions.[7] The result has been a virtual flood of disability appeals and the commensurate overflow of remands to the Commissioner. To stem the tide of remands, the many of the distinguished judges in this Circuit have sought to ameliorate the harsh command to remand when *Stone* error is committed by exploring the ALJ's decision to see if the *Stone* standard was in fact used by the ALJ, either in his step-two analysis or at some other step.[8] Even then, if the ALJ's decision does not clearly reflect that the *Stone* standard was used, or if there is some ambiguity in that regard, remand has been ordered most often.[9] Also, if the ALJ does find that the claimant's impairment *is* severe, the absence of citation or reference to Stone is not error warranting remand. Most recently, *Jones v. Astrue*, 2012 WL 1085528 (N.D.Tex. March 12, 2012, J.

---

[7]   This has happened with such frequency that the omission is now referred to simply as "*Stone* Error."

[8]   See cases sited note 2 , Jones v. Astrue,

[9]   *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp.2d 823, 835 (N.D.Tex.2008) (indicating that the Fifth Circuit's remand mandate in *Stone* left lower courts with no discretion to conduct harmless error analysis to determine if remand was proper when the ALJ failed to apply the *Stone* severity standard). The ALJ's failure to apply the *Stone* standard is a legal error, not a procedural error, and the claim must be remanded to the Secretary for reconsideration unless the correct standard is used. *Stone*, 752 F.2d at 1106; see also *Johnson v. Astrue*, No. H–08–3658, 2010 WL 148411 at *17 (S.D.Tex. Jan.11, 2010) (remand required where the ALJ cited to the *Stone*, but nonetheless applied incorrect standard); *Neal v. Comm'r of Soc. Sec. Admin.*, No.3:09–CV–0522–N, 2009 WL 3856662, at *1 (N.D.Tex. Nov.16, 2009) (Godbey, J.) (ambiguity as to whether proper legal standard was used in making severity determination must be resolved at the administrative level); *Brown v. Astrue*, No.4–08–CV–155–A, 2009 WL 1402287 at *3-4 (N.D.Tex. May 18, 2009) (McBryde, J.) (same); *Bradshaw v. Astrue,* 2008 WL 4387087 (N.D.Tex.Ramirez, MJ.)**.**

6

McBryde) highlights the dilemma the court faces when the ALJ commits a *Stone* error. In both the magistrate judge's and the district judge's writings, they recapitulate the *Stone* error cases decided by the judges of the courts in this district.  Magistrate Judge Cureton posits that due to the many decisions by the other magistrate and district judge's in the district,  the remand command of *Stone* must be followed. And so he recommended remand to the district judge.  In rejecting Cureton's recommendation,  Judge McBryde opined that **Stone** does not command remand unless a harmless error analysis is performed by the court and that analysis reflects harmful error occurred.

<u>Step-Two Severity Analysis by ALJ</u>

In this case, I find that the ALJ failed to cite or reference *Stone* or the *Stone* standard at all anywhere in her decision. Accordingly, I reviewed the decision to determine if she did <u>use</u> the *Stone* standard to determine whether Abernathy's impairments were "severe" or not.  In her step-two analysis the ALJ identified and discussed at length four of Abernathy's impairments, two physical (asthma and hearing loss) and two mental (mood disorder and ADHA) finding them (individually or in combination) to be unlisted[10] but nonetheless severe.[11]  But as to Abernathy's intellectual function, she made no severity finding at all, either "severe" or "not severe." Instead, relying upon the consultive psychologist's evaluation conclusion to "rule out borderline intellectual function,"[12] the ALJ discounted the previously reported "low intellectual functioning as a child"[13] and previous "borderline intellectual functioning" assessment from six years earlier.[14]  The ALJ

---

[10]     Tr. 19

[11]     Tr. 16

[12]     Richard Kownacki Psychological Evaluation of March 4, 2008, (Tr. 246).

[13]     Burkburnet I.S.D. Confidential Psychological Evaluation (October 1, 2002) (Tr. 459).

[14]     Pat Moran, PhD Report of July 31, 2002 (Tr. 461-68).

essentially ruled out consideration of "mental retardation" as an impairment of Abernathy by her statement, "For such reasons, Section 12.05 is rejected specifically."(Tr. 20, paragraph 2.) Referencing the mandates of Sections 12.02, 12.03, 12.04 and 12.06 (which all relate to different manifestations of mental impairments), the ALJ did address the other identified mental impairments of Abernathy using the "technique."[15] But since she had "specifically" rejected Section 12.05, the ALJ did not engage in "the technique" to evaluate the impact, if any, of Abernathy's intellectual functioning (limited or otherwise).  The subsequent step-three, step-four and step-five parts of the ALJ's decision do not reflect that the ALJ considered any non-exertional limitation in Abernathy's functioning arising from any diminished intellectual capacity. Nor do the interrogatories to the vocational expert and their answers reflect any such consideration.

I find that the ALJ's decision does not reflect whether she used the *Stone* standard or some other standard to determine the degree of severity of Abernathy's four identified impairments, but that is of no consequence since she found them to be severe at step two and proceeded in the remaining steps to analyze and evaluate the effect of those severe infirmities on Abernathy's residual functional capacity as it relates to jobs available in the workplace.

But this begs the question of whether the ALJ erred in specifically rejecting consideration of Abernathy's intellectual functional capacity (subaverage general intellectual functioning) in the light of the signs of such limitation in the record predating the hearing and in the light of post-hearing materials and argument furnished by Abernathy's representative.

---

[15]     Section 404.1520a describes the "special technique" of mental impairment evaluations:  "Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment."

<u>ALJ Rejection of Mental Retardation</u>

A review of the ALJ's decision reflects that the only specific explicit comments, findings, references to Abernathy's intellectual functioning capacity were, as follows:

"The claimant's Mother reported that the claimant had a fascination with fire as a child, and still does to some extent.  The claimant had low intellectual functioning as a child, but the examining psychologist indicated that he functioned above the level of mental retardation and only assessed 'rule out' borderline intellectual functioning (Exhibit 5F).  Even with the low scores in 2002, the psychologist assessed borderline intellectual functioning (Exhibit 18E).  For such reasons, Section 12.50 is rejected specifically.  Additional testing does not appear to be helpful, due to equivocal findings on some past tests."[16]

...   ...   ...

"There is no specific listed impairment for a borderline level of mental functioning."[17]

<u>The Record</u>

Before the ALJ in this case were two psychological reports, one prepared in 2002 by Dr. Pat Moran when Abernathy was almost 14 years of age,[18] and one by Richard Kownacki prepared six years later in 2008 when Abernathy was almost 20 years of age.[19]   In his report, Dr. Moran relates that his evaluation revealed that Abernathy has a Full Scale IQ of 68 which places his IQ score in the intellectually deficient range and that his performance resulted in a Verbal IQ scale score of 66 and a Performance IQ of 73.  This he opined

---

[16]     Tr. 20, paragraph 2.

[17]     Tr. 20, last sentence, paragraph 3.

[18]     Tr. 461-68.

[19]     Tr. 244-47.

rendered an Axis II[20] of "Borderline Intellectual Functioning."  He also reported and noted that Abernathy 'shows major impairment in several areas including family relations, judgment, thinking, mood and school functioning."[21]  The Moran report was summarized in Abernathy's school psychological evaluation of that same year that concluded that his low intellectual functioning and other health impairments (ADHD) appeared to be major factors in the lack of progress of his educational performance, warranting special education services in all areas of eligibilities.[22]

In defining the scope of his examination and evaluation at the beginning of his report, Dr. Kownacki referenced the "Referral Question" and "Chief Complaints."[23]  Nowhere was Abernathy's level of intellectual functioning or capacity mentioned as a part of his assigned evaluation mission.  Rather it was other areas of mental disorders that were referenced (Anxiety Disorder, Bipolar Disorder, ADHD.)  In reporting Abernathy's mental status, Kownacki noted his speech was characterized by poor vocabulary and grammar, his thought processes appeared to be logical and coherent, his short-term memory was fair, his attention

---

[20]     Mental health professionals use Axis I to report all the various mental disorders except for personality disorders and mental retardation; Axis II for personality disorders and mental retardation; Axis III for general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder; Axis IV for psychosocial and environmental problems that may affect the diagnosis, treatment and prognosis of mental disorders; and Axis V for the individual's global assessment of functioning ("GAF"). See Diagnostic & Statistical Manual Of Mental Disorders (" DSM–IV ") (4th ed.1994) at 25–30.

[21]     Tr. 463.

[22]     Tr. 459-60.

[23]     Tr. 244.

and concentration were fair, and his abstract ability seemed to be intact, and his fund of knowledge was poor.  But since he could properly interpret a proverb, "Don't count your chickens before the hatch,"  Kownacki concluded Abernathy had "basically intact abstract reasoning that argues against mental retardation."  And so concluding,  Kownacki reported on Axis II "Rule out Borderline Intellectual Functioning."

It is this Kownacki report to which the ALJ refers in concluding that "Listing 12.05 is specifically rejected" and "Additional testing does not appear to be helpful, due to equivocal findings on some past tests."

Mental Retardation

This case involves the interplay between step-two severity analysis (to which the *Stone* severity standard is mandated) and Listing 12.05 (in which use of the 'technique" is mandated) in so far as these provisions relate to the mental impairment known as mental retardation.  Abernathy argues that the ALJ failed to apply the "technique" mandated by 20 C.F.R. § 404.1520a to Abernathy's sub-average intellectual functioning implicated by his low IQ scores in grade school. Had the "technique" been properly applied, the full scale IQ of 68 necessitates "closer work supervision,"  thereby interfering with Abernathy's ability to work.  This constitutes a "severe" impairment as defined by *Stone*. And thereby Abernathy argues that the ALJ committed a *Stone* error that requires remand.

The Commissioner counters that with respect to Abernathy's mental capacity the ALJ never reached the threshold for a severity determination under Listing 12.05 (A)-(D) or at step-two since Abernathy failed  to establish that any limitation of his intellectual capacity met the diagnostic description of mental retardation provided in Listing 12.05.  Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation and

11

four sets of severity criteria (paragraphs A through D).

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning **with deficits in adaptive functioning** initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."
The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
Or
B. A valid verbal, performance, or full scale IQ of 59 or less;
Or
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related *limitation of function*;
Or
D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
   1. Marked restriction of activities of daily living; or
   2. Marked *difficulties in maintaining* social *functioning*; or
   3. Marked difficulties in maintaining concentration, persistence, or pace; or
   4. Repeated episodes of decompensation, each of extended duration."
 (Emphasis supplied)

<u>Randall v. Astrue Case</u>

Relying on the Fifth Circuit's holding in *Randall v. Astrue*, 570 F. 3d 651 (2009), the Commissioner argues that the ALJ determined that Abernathy failed to prove that his mental condition met that part of the diagnostic description requiring "deficits in adaptive functioning." Having failed to meet that part of the diagnostic description, Abernathy's intellectual capacity was not an impairment for the ALJ to consider in his step-two or step-three analysis. Abernathy retorts that the ALJ's decision says nothing about Abernathy not meeting the diagnostic description of Listing 12.05 or failing in his proof that he had "deficits in adaptive functioning."

The Fifth Circuit's decision in *Randall* is distinguishable from this case. In *Randall* the ALJ <u>expressly</u> concluded that Randall's borderline mental limitation did not meet or equal one of the

listed impairments in Appendix 1, "because Randall had failed to meet 'the threshold requirement of mental retardation, as defined as significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.' "[24]   In reaching this conclusion, the ALJ in *Randall* discussed and made <u>express</u> findings on the claimant's functioning capacities in daily activities.[25]

In this case, the ALJ did not refer to or discuss the effects, if any, on Abernathy's adaptive functioning arising from his subaverage general intellectual functioning which was clearly evidenced by the subaverage IQ scores.   And there are no such findings in that regard either in the ALJ's step-two severity discussion or in her the step-three RFC determination.

When there is evidence of a *mental* impairment that allegedly prevents a claimant from working, the ALJ must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a and the Listing of Impairments and document the procedure accordingly.  This procedure first requires the ALJ to determine the presence or absence of certain medical findings that have been found especially relevant to the ability to work, sometimes referred to as the Part A criteria, under 20 C.F.R. § 404.1520a (b). Then the ALJ must evaluate the degree of functional loss resulting from the impairment, using the Part B criteria, under 20 C.F.R. § 404.1520a (c). To record her conclusions, the ALJ then typically prepares a standard document called a Psychiatric Review Technique Form (PRTF) that tracks the listing requirements and evaluates the claimant under the Parts A and B criteria. The ALJ did not discuss the presence or absence of  medical findings nor did she prepare a PRTF.  Whether the ALJ jumped to the conclusion that Abernathy's subaverage general intelligence was not accompanied by  "deficits in adaptive functioning" or that his IQ scores

---

[24]     *Randall* at p. 654

[25]     *Id*. p. 654.

posed no "additional...limitation of function" is not reflected in the decision.[26]  Neither is it apparent from the decision whether the ALJ determined that Abernathy's IQ increased over time from the 2002 tests by Dr. Moran until 2008 when Dr. Kownacki quizzed Abernathy about the chicken adage.

It is not the function of the court to make these findings or determinations from the record. That is the ALJ's job.  Here the ALJ did not do her job.  She simply "specifically rejected" any consideration of the effects of Abernathy's subaverage intellectual functioning capacity.  Apparently she did so because of the Kownacki evaluation report wherein Kownacki "ruled out" borderline intellectual functioning solely because Abernathy properly interpreted the proverb "don't count your chickens before they hatch" to mean "don't expect something until it happens."[27] Kownacki reached this conclusion even though he had already observed that Abernathy had poor grammar, had limited recall of simple words, had trouble with serial 7's, had a poor fund of knowledge, and his judgment and insight appeared to be poor."[28]

The ALJ was correct in her factual and legal conclusion that there is no Listing for "borderline level of mental functioning."  That phrase though used by Drs. Moran and Kownacki and by the school evaluator appears nowhere in the regulations.  Rather the descriptive phrase in Listing 12.05 is "subaverage general intellectual functioning."  It is unclear from the language of the decision itself whether the ALJ rejected Listing 12.05 because of the use of "rule out borderline

---

[26]      The Court in *Randall* failed to adequately explain any distinction between "deficits in adaptive functioning" as the definition of mental retardation in the introductory sentence in 12.05 and the phrase "additional and significant work-related limitation of function" as used in part C of 12.05. In this case, even the ALJ's own decision  reflects the existence of "significant work-related limitations of function" arising from Abernathy's *other* "severe" physical and mental impairments.

[27]      Tr. 246.

[28]      Tr. 245-46.

intellectual functioning" or because of some lack of proof of deficit in adaptive functioning.   Just like a failure to refer to *Stone* or reflect the use of the *Stone* standard in determining the severity of a recognized impairment is error, the ALJ's failure to reference the standard by which she determined that Listing 12.05 should be rejected is an error.

<u>Harm or No Harm</u>

The Commissioner posits that in the absence of evidence in the record of then current deficits in Abernathy's adaptive functioning resulting from his intellectual limitations, Abernathy failed to meet his burden of proof that his subaverage general intellectual functioning met the Listing 12.05 definitional standard for mental retardation.   The Moran Report and the Abernathy's high school's Psychological Evaluation[29] clearly reflect the Abernathy had adaptive functioning deficits in the school and home contexts in 2002 when Abernathy was 14 years of age.   There is no evidence in the record that his subaverage general intellectual capacity or his IQ changed from 2002. Lacking any subsequent testing data, lacking a precise analysis of Abernathy's intellectual functioning capacity, the Kownacki report certainly does not support the ALJ's rejection of a proper analysis of Abernathy's intellectual  impairment pursuant to the mandates of the Regulations.

Therefore, the ALJ's failure to apply and discuss Listing 12.05 was reversible error warranting remand.   The ALJ's conclusion to summarily, and without explanation or elucidation, "specifically reject 12.05" was error that also prevented a proper analysis of Abernathy's RFC at step-four which should have been incorporated into the limitations recited to the vocational expert at step-5.   The error was harmful error.

I recommend to the District Court that the decision of the Commissioner be reversed and the cause be remanded to the Commissioner for a determination of  whether Abernathy's intellectual

---

[29]      Tr. 456-460.

limitations meet the requisites of Listing 12.50, and if so, the severity thereof and its effect upon

Abernathy's residual functional capacity, and whether Abernathy is thereby disabled.

It is so ordered this 15th day of May, 2012

_____
Robert K. Roach
UNITED STATES MAGISTRATE JUDGE

<u>Standard Instruction to Litigants</u>

A copy of this report containing findings and recommendations shall be served on all parties in the manner provided by law.  Any party who objects to any part of this order, report, findings and recommendations must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).